
IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

BRYAN M. TARTER,

          Plaintiff,

vs.

THRONE LAW OFFICE, P.C. and
JACOB T. HASEMAN,

          Defendant.

CV 17-123-BLG-SPW

OPINION AND ORDER

Plaintiff Bryan Tarter filed this action against the Defendants, his former lawyers, Throne Law Office and Jacob Haseman, for legal malpractice. (Doc. 1-2). Now pending before the court is Defendants' motion for summary judgment on three of Tarter's damage claims and his claim for attorney's fees related to the underlying action in which Tarter alleges the legal malpractice occurred. (Doc. 17).[1]

## I. Statement of Facts

Tarter and his family have a ranch in southeastern Montana. (Doc. 1-2 at ¶ 9). The ranch consists of approximately two pieces of land: the first piece the Tarters refer to as "Section 12," which consists of 640 acres; the second they refer

---

[1] Defendants moved for summary judgment on Tarter's request for prejudgment interest. (Doc. 18 at 47). Tarter withdrew this request, however. (Doc. 21 at 41), so the court will not analyze the issue.

to as "Section 6" which consists of 660 acres. (Doc. 22-5 at 45:6-20). Tarter used Section 12 and Section 6 to grow hay and graze cattle. (*Id.*) He also holds several grazing permits on the Custer National Forest, encompassing 7,000 acres adjacent to his property. (*Id.* at 184:24-190:1; 202:2-6).

In 2010, Arch Coal, Inc. planned to develop a coal mine, known as the Otter Creek mine, near Tarter's ranch. (Doc. 8 at ¶ 7). Arch Coal's real estate arm, Ark Land Company,[2] approached Tarter about surface access use and a water monitoring agreement on Tarter's Section 12 property for the mine. (*Id.*) After some discussion with Arch Coal representative Doug Downing, Tarter suggested that Arch Coal "skip" the access angle and consider purchasing Section 12 instead. (Doc. 20-1 at 25).

By December 2010, at Arch Coal's suggestion, Tarter had retained Jacob Haseman from the Throne Law Office to represent him during the Section 12 sale. (*Id.* at 26). In March 2011, Arch Coal offered to purchase Section 12 for two million dollars. The offer included $500,000 down and annual installments of $100,000 over fifteen years. (Doc. 8 at ¶ 15). In addition, Arch Coal also offered Tarter: (1) a grazing lease on Section 12 so that Tarter could continue to use the

---

[2] The remainder of this order refers to Ark Land and Arch Coal collectively as Arch Coal.

property for a period of time; and (2) a repurchase option giving him the exclusive right to re-purchase Section 12. (*Id.*)

## A. The Sale

From January 2011 to May 2011, Downing and Tarter negotiated the "main parts of the deal," without involving their lawyers, which was to "sell Section 12, lease it back til mining, and then repurchase it when [Arch] was through with it." (Docs. 22-5 at 117:16-23, 118:10-23; 22-12 at 35-36; 8 at ¶ 14). In May, Arch Coal's attorney, Alan Bryan, provided Haseman the draft agreements regarding the proposed sale. (Doc. 8 at ¶ 15). After Haseman forwarded the documents to Tarter, Tarter reviewed and commented on various drafts. (Doc. 20-5 at 133:4-134:6, 156:20-160:2). According to their billing records, Throne Law Office spent nearly 20 hours reviewing and revising the proposed sale documents. (*See* Doc. 22-8). Haseman communicated his impressions of the provisions in the agreements to Tarter, and Tarter provided input to Haseman on the provisions that were important to him. (Doc. 22-5 at 146:2-11).

According to Haseman's notes of his conversations with Tarter in May and June, the two million purchase price and the down payment were acceptable to Tarter, but Tarter preferred the balance paid over nine years, not fifteen. (Doc. 22-7 at 19). Also Haseman's notes state that, according to Tarter, some "situations aren't described correctly" in the drafts, that the "lease-back" and "buy-back"

3

options "were there," (*id.* at 17), but that "Downing represented Tarter would get it back at minimal cost" and the "current proposal was contrary to this understanding." (*Id.* at 21).

On June 21, 2011, Tarter, Haseman, Downing, and Bryan met in person at the Throne Law Office in Sheridan, Wyoming. (Doc. 22-5 at 169:9-170:10). They discussed the sale agreements line-by-line. (*Id.* at 169:9-170:10). The meeting lasted eight hours and a Sale and Purchase Agreement, Grazing Lease, and Purchase Option were finalized and executed that day. (Doc. 8 at ¶¶ 19-20). Arch Coal paid Tarter the $500,000 down payment on July 1, 2011. (Doc. 8 at ¶ 23). The closing was completed by July 15, 2011. (*Id.*)

### 1. The Sale Documents

#### a. The Sale and Purchase Agreement

According to the Sale and Purchase Agreement, the final agreed upon purchase price was $2 million, or $3,125 per acre, with $500,000 cash due on the closing date. (Doc. 22-9). Annual installments of $166,666.67, were to be paid over the next nine years until paid in full. (*Id.*) The purchase price was not secured by a deed of trust or mortgage. (*Id.*) The parties dispute whether Haseman or anyone from the Throne Law Firm discussed securing the property with Tarter at or before the sale. (Doc. 22-5 at 2:13:8-215:10, 239:7-241:1; Doc. 20-3 at 56:1-21; Doc. 20-4 at 285:18-286:2).

Under Paragraph 9 of the Sale and Purchase Agreement, Tarter also received the first right to lease additional property that Arch Coal owned and leased to Tarter's neighbors, Keith and KP Stevens, as well as certain lands elsewhere in Powder River County, if the land became available after the Sale and Purchase Agreement, if Arch Coal decided to lease the land, and if the land was used for agricultural purposes. (Doc. 4 at ¶ 32; Doc. 20-2 at 176:20-178:2; Doc. 22-9). Arch Coal retained full discretion whether to lease the land to Tarter should it become available. (Doc. 20-3 at 47:8-15; 48:12-49:9). From the time the Sale and Purchase Agreement was signed, none of the land leased to the Stevens has come up for lease, nor has the chance to lease any of the other land identified in Paragraph 9 arisen. (Doc. 20-2 at 27:23-28:5, 182:25-183:2; 189:7-19).

Under Paragraph 9 of the Sale and Purchase Agreement, Arch Coal agreed to execute and deliver a Grazing Lease for Section 12 after closing. Under Paragraph 10, Arch agreed to grant Tarter the option to purchase Section 12 upon the terms and conditions of a Purchase Option. Both documents are discussed in more detail below.

### b.    The Grazing Lease

The Grazing Lease grants Tarter the right to continue to ranch Section 12 for a ten-year term post sale. (Doc. 22-11). The Grazing Lease is renewable for an additional ten years, after the first ten years, until 2031, and then terminates with

no provision for an additional renewal. (*Id.*) If the mine is developed before 2031, Arch Coal may terminate the lease by providing Tarter written notice that it has a mining permit for the land. (*Id.* at 2). Tarter's lease terminates nine months after service of that written notice. (*Id.* at 3).

### c.    The Purchase Option

The Purchase Option grants Tarter the exclusive right to repurchase Section 12. (Doc. 22-10). Tarter has one year from the date Arch Coal serves him with a Notice of Right to Exercise Option to make the purchase. (*Id.* at 1). The Purchase Option anticipates that Arch Coal will serve notice on Tarter after all bonding for Section 12 under the applicable mining permits is released, provided however, that the timing is in Arch Coal's "sole and absolute discretion." (*Id.*). If Tarter exercises the Option, Arch Coal is required to convey the property to him by quitclaim deed for $250 an acre. (*Id.* at 2). The parties dispute whether the form of the deed (quitclaim versus warranty deed) required by the Purchase Option for reconveyance was ever discussed or suggested. (Doc. 20-3 at 43:14-16; Doc. 22-5 at 165:2-25).

### B.    Post-Sale

After executing the Sale and Purchase Agreement, Arch Coal made its annual installment payments to Tarter in 2012, 2013, 2014 and 2015. (*Id.* at ¶ 23; Doc. 19 at 10). In 2012, Arch Coal encumbered Section 12 with a mortgage from

6

PNC Bank in the amount of three billion dollars. (*Id.* at ¶ 25; Doc. 19 at 10). In 2013, Arch Coal encumbered Section 12 with another mortgage from UMB Bank, N.A. in the amount of seven billion dollars. (Doc. 19 at 10).

In January 2016, before making the next annual payment to Tarter, Arch Coal and Ark Land Company filed for jointly administered Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the Eastern District of Missouri. (*Id.* at ¶ 25). Upon declaring bankruptcy, Arch Coal informed Tarter that he was an unsecured creditor and that he would not be paid under the sale documents until a reorganization plan was confirmed. (Doc. 22-13 at 46; Doc. 22-14 at 235:18-25). Tarter did not understand why he was an unsecured creditor and contacted Defendants for advice. (Doc. 22-3 at 59:2-63:4; Doc. 22-12 at 38). On January 20, 2016, Haseman contacted Rebecca Case, a Missouri bankruptcy lawyer, to assist and represent Tarter in the Arch Coal bankruptcy proceedings. (Doc. 22-15).

Case explained to Tarter that, as an unsecured creditor, his Promissory Note obligating Arch Coal to pay him was not secured by a mortgage, so he was "looking at probably the worst outcome in a Chapter 11 case, which is being at the bottom of the priority scheme." (Doc. 22-3 at 47:6-48:5, 49:9-17; 52:12-53:4). She anticipated that he would "receive maybe cents on the dollar, maybe stock, maybe nothing[.]" (*Id.* at 53:18-20). Nonetheless, Case attempted to negotiate an

7

agreement with Arch Coal to pay Tarter the unpaid balance owing on Section 12 and otherwise treat him like a secured creditor. (*Id.* at 68:17-72:24). Case hoped that she could use Tarter's support for the Otter Creek mine as leverage to obtain a secured creditor position with Arch Coal. (*Id.*). During her efforts to negotiate, however, Arch Coal announced that it was suspending its plans to develop the Otter Creek mine. (*Id.* at 140:17-142:22).

## C.    Bankruptcy Proceedings

Case moved the bankruptcy court for an order forcing Arch Coal to either assume or reject the Sale and Purchase Agreement and related documents, including the Grazing Lease and the Purchase Option. (*Id.* at 172:25-173:20). Case asked Haseman to prepare a valuation of a ranching operation like Tarter's operation, including the potential value of additional adjacent lands contemplated under the Sale and Purchase Agreement, for use in the bankruptcy action. (Doc. 20-4 at 18:6-16; 281:10-21). Because he had limited information on Tarter's actual ranch numbers, Haseman based his estimate on typical market rates in Billings' sales barns, and typical annual units per month. He did not take into consideration market variations or property conditions. (*Id.* at 17:21-19:3). Case did not include Haseman's valuation estimate in her motion. (Doc. 20-8 at 277:15-24). Arch Coal opposed the motion.

8

The bankruptcy court determined that, because the Sale and Purchase Agreement did not require, and Arch Coal did not execute, a deed of trust to secure payment of the Promissory Note, Tarter was an unsecured creditor with an unsecured claim and "may receive at most cents on the dollar" if Arch Coal's reorganization plan was confirmed. (*Id.* at ¶¶ 11- 12). The bankruptcy court also found that although the Grazing Lease and the Purchase Option were recorded in Powder River County, Montana on July 1, 2011, before the two mortgages totaling over seven billion were recorded on Section 12, (Doc. 22-19 at 10), it is undisputed that if the Purchase Option is triggered, Arch Coal shall convey the land to Tarter via quitclaim deed, which includes all encumbrances, specifically the two multi-billion-dollar mortgages. (Doc. 22-10 at ¶ 5).

The bankruptcy court found that neither the Grazing Lease nor the Purchase Option contained any contingency in the event Arch Coal did not develop the mine. Specifically, the bankruptcy court found that the Purchase Option does not include any provision granting Tarter the right to purchase Section 12 in the event the proposed mine is not developed, (doc. 22-19 at ¶ 15), and that the Grazing Lease may expire before Arch Coal obtains a mining permit. (*Id.* at ¶ 16).

The possibility or risk that Arch Coal may not obtain a mining permit or develop the Otter Creek Mine, thus failing to trigger the Purchase Option or Grazing Lease is not addressed in the Sale and Purchase Agreement, Grazing

Lease, Memorandum of Notice of Grazing Lease, Purchase Option, Memorandum Notice of Purchase Option, or any of the other exhibits to the Sale and Purchase Agreement. (Doc. 22-19 at ¶ 17). The parties, Arch Coal's counsel, and Tarter's bankruptcy counsel all dispute whether a mine must be built, reclaimed, and a bond released before Tarter may exercise the Purchase Option. (Doc. 22-18 at 2-3).

The bankruptcy court held that by failing to address the possibility that Arch Coal may never obtain a mining permit, the practical effect on the Purchase Option is, "[i]f the Otter Creek mine is not built, Tarter may never have the opportunity to exercise his Purchase Option and Arch Coal's real property may forever remain subject to Tarter's Purchase Option." (Doc. 22-19 at ¶ 16). The bankruptcy court determined that these risks were not unexpected contingencies and should have been addressed in the sale documents. (*Id.* at 18). Based on these findings, the bankruptcy court denied Case's motion and entered an order requiring Arch Coal to reject the Sale and Purchase Agreement and Promissory Note, but to assume the Grazing Lease and Purchase Option. (Doc. 22-19).

Tarter, as an unsecured creditor, received a distribution of $14,846.61 on his claim following confirmation of Arch Coal's Chapter 11 plan of reorganization. (Doc. 4 at ¶ 55). Tarter wrote off the loss from the discharged debt on his 2016 taxes and received a tax refund from taxes paid in previous years on the income from the Section 12 sale. (Doc. 22-5 at 72:1-72:5; 72:18-73:24). Tarter received a

$126,000 refund from his federal tax filing and anticipates receiving a $50,000 from his Montana state tax filing. (*Id.* at 72:18-73:24).

### D.    Claimed injuries and damages

In August 2017, Tarter sued Defendants for professional negligence during their representation of him in the Section 12 property sale. (Doc. 4 at ¶¶ 71-73). Tarter has alleged damages resulting from Defendants' failure to secure the Sale and Purchase Agreement, including the unpaid purchase price ($833,333.67), Case's legal fees incurred in the bankruptcy action ($60,691.65), and the initial attorneys' fees he paid to Throne ($9,731.31). (Doc. 20-11 at 1-2).

Tarter also alleges lost opportunities and resulting profits, including: (1) the lost opportunity to exercise his first right to lease adjacent land owned by Arch Coal; (2) the lost opportunity to either continue grazing the Section 12 property, or to repurchase it, because the documents failed to address what happens in the event the mine is not developed, and (3) the lost opportunity to re-purchase the property at the agreed upon re-purchase price because the re-purchase is by quitclaim deed, meaning that Tarter's right to re-purchase is subject to any encumbrances on the property. (Doc. 21 at 18; Doc. 22 at 48). Defendants move for summary judgment on the lost opportunities and profits set forth above, as well as the attorneys' fees Tarter paid to Throne for the Section 12 sale transaction.

## II.    Legal Standard

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).  An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party and a dispute is "material" only if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In considering a motion for summary judgment, the court "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 130, 150 (2000); *Anderson,* 477 U.S. at 249-50.  The Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in the non-moving party's favor. *Anderson,* 477 U.S. at 255; *Betz v. Trainer Wortham & Co., Inc.,* 504 F.3d 1017, 1020-21 (9th Cir. 2007).

## III.   Discussion

As Tarter points out, the aim of compensatory damages is to restore the injured party to "the position or state the party would have attained" but for the

tort. (Doc. 21 at 23) (quoting *Billings Clinic v. Peat Marwick Main & Co.*, 797 P.2d 899, 914 (Mont. 1990). Claims for lost profits damages caused by lost opportunities may only be awarded, however, "if such loss is shown to be the 'natural and direct result of the act of the defendant and if the loss is not speculative." *Olson v. Parchen*, 816 P.3d 423, 427 (Mont. 1991).

"Speculative damages not clearly ascertainable are not recoverable." *Hallenberg v. General Mills Operations, Inc.*, 141 P.3d 1216, 1221 (Mont. 2006). Although uncertainty as to the amount of any alleged lost profits is not improper speculation, "uncertainty about 'whether the loss of profits is the result of the wrong and whether such profit would have been derived at all" renders the evidence inadmissible as speculative profits. *Olson*, at 348, 816 P.2d at 427 (quoting *Stensvad v. Miners and Merchants Bank of Roundup*, 640 P.2d 1303, 1310 (Mont. 1982)). A legal malpractice plaintiff's burden of proving a lost opportunity is to establish that it is *"more probable than not"* that the plaintiff would have recovered the lost opportunity but for the attorney's negligence. *Labair v. Carey*, 383 P.3d 226, 231 (Mont. 2016) (emphasis in original).

### A. Tarter's lost opportunity to lease adjacent land and corresponding profits is speculative.

Defendants argue that Tarter's claim for lost opportunity to lease lands adjacent to Section 12 and the corresponding lost profits is speculative and should be subject to summary judgment. The court agrees. Tarter's lost opportunity to

lease Arch Coal's land adjacent to Section 12 at some point in the future, if the land becomes available for lease, and if Arch Coal decides to lease the land, is not compensable because Tarter has not produced any evidence demonstrating that it is more probable than not that any such lease would occur.

Tarter alleges that his right to lease adjacent lands from Arch Coal is lost forever because the Sale and Purchase Agreement Haseman failed to secure was rejected in the bankruptcy. (Doc. 21 at 29). But Haseman's alleged negligence is irrelevant to this issue. Because Tarter does not provide any evidence that even a possibility existed for him to lease the land in the past or in the future, his losses are speculative and subject to summary judgment. *See Olson,* 816 P.2d at 427 (concluding losses were too speculative when a question existed as to "whether [any] profit would have been derived at all[.])"

In *Olson,* the plaintiff alleged he lost rent and profitable gain on the subsequent sale of the real property because he was not able to complete renovations on the property due to his injury. 816 P.2d at 427. The plaintiff, however, had completed only two percent of the renovation work in the two years prior to suffering his injuries at issue in the lawsuit. *Id.* The Montana Supreme Court found that the plaintiff only "intended" to restore and renovate the property, that he "might have been able" to rent the restored property, "and that he might have garnered greater profits on the sale of the restored rental properties." *Id.* at

427. The Court concluded the losses were speculative because a question existed "whether such profit would have been derived at all[.]" *Id.*

Just as Olson's intentions to renovate resulted in only speculative profit, Tarter's intention to lease Arch Coal's land if it came up for lease and running his ranch on that land at a gain of $350,000, also results in entirely speculative profits. Tarter's speculative leasing opportunity is dependent on numerous factors outside of his control, including the current lessees giving up the lease, and Arch Coal's decision whether to re-lease the land at all. In other words, Tarter has presented nothing more than evidence that he "intended" to lease this property, and that he "might" have made a profit by expanding his ranching operations to that property. Tarter's plans raise a significant question of whether his alleged loss is of a profit that he would have derived at all. In accordance with *Olson*, Defendants' motion for summary judgment on Tarter's lost opportunity and associated lost profits with respect to leasing land adjacent to Section 12 is granted.

### B. Tarter cannot prove he lost an opportunity to continue to ranch Section 12 because of Haseman's alleged negligence.

Defendants argue that Tarter cannot prove that he would have an opportunity different than his current opportunity to graze Section 12 for 20 years under the Grazing Lease because of Haseman's improper drafting. Again, the court agrees. Under the Grazing Lease, Tarter contracted to lease Section 12 for twenty years, terminable at any time with written notice that Arch received a mining permit for

the land. The fact that Arch did not assume the Sale and Purchase Agreement in the bankruptcy because of Haseman's alleged negligence did not affect this right.

The undisputed facts show that since the sale to Arch in 2011, the useable acres available to Tarter to lease have remained the same, as has the scope of his ranching operation. (Doc. 22-5 at 46:7-47:10). Tarter knew that nothing guaranteed when Arch would obtain a mining permit, thus there was no guarantee that he would be allowed to lease Section 12 for the full 20 years. (*Id.* at 93:6-13; 204:1-7). Furthermore, if and when Arch obtains a mining permit, Tarter loses the use of Section 12 if and until Arch decides to sell Section 12. (*Id.* at 204:1-7). In fact, Tarter admitted that he could be precluded from leasing Section 12 for "whatever period of time," until Arch decided to offer him the repurchase rights, which is "why he needed all of the money [he] sold it for." (*Id.* at 203:1-7). None of these factors are impacted by the Purchase Option or Haseman's failure to secure the Sale and Purchase Agreement. Accordingly, Tarter cannot prove that he lost any opportunity with respect to the Grazing Lease provision due to Haseman's drafting. Defendants' motion for summary judgment on Tarter's lost opportunity and lost profits with respect to leasing Section 12 is granted.

### C. Tarter's lost opportunity to re-purchase Section 12 at the agreed upon re-purchase price without encumbrances.

Defendants argue that Tarter's lost opportunity claim to repurchase Section 12 is speculative and also subject to summary judgment. Defendants argue that

16

because Arch has the sole and absolute discretion to sell Section 12, Tarter does not know whether Arch would have agreed to sell Section 12 to him and thus cannot prove he is entitled to $160,000 in damages for the value of the land. (*Id.*). In support of this argument, Defendants argue that for Tarter's claim to survive summary judgment, Tarter must prove that "but for" Defendants' negligence: (1) he would have had the option to purchase Section 12, (2) he would have been able to exercise that option, (3) would have exercised it, and (4) would now own Section 12. (Doc 24 at 11). The Montana Supreme Court already rejected a similar argument, however. *See Labair v. Carey,* 291 P.3d 1160 (Mont. 2012) (*Labair I*) and *Labair,* 383 P.3d at 226 (*Labair II*).

In *Labair I,* former clients brought a legal malpractice action against their attorney after the attorney allowed the medical malpractice statute of limitations to lapse. 291 P.3d at 456. The district court granted summary judgment for the lawyer because the Labairs had failed to establish a prima facie legal malpractice case when they failed to provide expert evidence on causation and damages. *Id.* at 457. On appeal, the Montana Supreme Court noted the Labairs' claim against their lawyer presented a unique case in that the Labairs lost not only the right to sue the doctor and recover a verdict for medical malpractice, but they also lost the opportunity to pursue a pretrial settlement. *Id.* at 465. Because the lost possibilities of securing either a verdict or a settlement were each potential injuries,

the Montana Supreme Court remanded the case to determine whether the Labairs could prove it was more probable than not that they would have recovered a verdict or a settlement but for their lawyer's negligence. *Id.* at 469.

On remand, the district court gave a jury instruction directing the jury to determine whether Labairs would have settled the underlying medical malpractice action. *Id.* at 232. On appeal, the Montana Supreme Court held that the instruction was reversible error because Labairs need only prove that they more probably than not would have recovered a settlement and the likely range of its value. *Id.* The Court rejected the lawyer's argument that the Labairs had to show they would have recovered a settlement because "it would be impossible to replicate the give and take of settlement negotiations [once the doctor was] shielded from liability by [the lawyer's] negligence." *Id.*

Here, Defendants' argument that Tarter's claim is subject to summary judgment because Tarter cannot prove he would now own Section 12 is akin to the lawyer's rejected argument in *Labair*. To survive summary judgment on this claim, like the Labairs, Tarter must only show that he more probably than not would have possessed a valid Purchase Option but for Haseman's negligence.

Defendants argue that because Arch has the sole and absolute discretion whether to give Tarter the opportunity to re-purchase Section 12, and Tarter does not know whether Archer would have agreed to sell Section 12 back to him, he has

failed to establish a causal connection between his lost opportunity and Haseman's negligence and his claim is too speculative. The court disagrees.

To determine whether Haseman's failure to properly draft the Purchase Option caused Tarter any damages, the court must first define the injury at issue. The injury suffered dictates whether Haseman's conduct was a "but for" cause of Tarter's injury. Here, Tarter is not alleging that Haseman's conduct is the reason Tarter does not own Section 12. Tarter testified that when he entered into the Sale and Purchase Agreement, he wanted to sell Section 12, lease it back until the mine was built, and repurchase it after the mine was reclaimed. But under the Purchase Option as drafted, Tarter may only repurchase Section 12 through quitclaim deed, and thus subject to two multi-billion-dollar mortgages. Also, there is nothing in the contract to trigger the option when Arch does not build the mine, which is the current situation.

The parties dispute whether Haseman discussed securing the Sale and Purchase Agreement with Tarter prior to the sale. The parties also dispute whether Haseman ever discussed using a quitclaim deed or a warranty deed for the Purchase Option, and the parties dispute whether a mine has to be built to trigger the Purchase Option. Had the Sale and Purchase Agreement been secured, Tarter would have a Purchase Option that would allow him the option to repurchase Section 12 at $250 an acre with no encumbrances. Tarter's damage is having a

Purchase Option that is either never triggered, or one that he cannot practically exercise if Arch Coal sells Section 12.

Tarter does not need to prove he would have purchased Section 12. Like the Labairs, it is impossible for Tarter to prove what would have happened but for his lawyer's negligence - in his case, that he would own Section 12 at this point - because it is impossible for him to replicate the give and take of the sales negotiations with Archer Coal after Haseman negligently drafted the Purchase Option. Accordingly, genuine issues of material fact exist whether Haseman was negligent for failing to secure the sale and failing to require a warranty deed in the Purchase Option.

While Tarter still has the burden of demonstrating the amount of damage he incurred because of the way Haseman drafted the Purchase Option, it cannot be disputed Tarter suffered the loss of a valid Purchase Option and genuine issues of fact exist regarding whether Haseman was the legal cause of that loss. Tarter has established that, but for Haseman's negligence in drafting the Sale and Purchase Agreement, which resulted in significant encumbrances on Section 12 and a genuine issue of fact whether Tarter may ever exercise the Purchase Option, Tarter would more probably than not possess the practical ability to purchase Section 12 through the Purchase Option. Accordingly, summary judgment is not appropriate on this claim or the associated lost profits.

20

### D. Tarter's Initial Attorney's Fees

Defendants argue that because the legal fees Tarter incurred during the transaction with Arch Coal were not caused by Defendants' negligence, and because Tarter obtained a significant benefit from Haseman's representation of him in that transaction, Tarter may not recover damages for his underlying legal fees.

Noting that Montana Courts have not squarely addressed the issue, Defendants nevertheless acknowledge that the Montana Supreme Court has implied that attorney's fees from the underlying action may be considered damages in a legal malpractice action when the damages would not have occurred "but for" the negligent conduct. *Labair I*, 291 P.3d at 1160; *see also Merzlack v. Purcell*, 830 P.2d 1278, 1279 (Mont. 1992) (ordering an attorney who breached his duty of reasonable care in representing his clients to return the attorney's fees paid by his clients with interest.). As noted above, Tarter has proven that he suffered lost opportunities because of Haseman's negligence drafting the Sale and Purchase Agreement and Purchase Option. Accordingly, the initial attorney fees Tarter paid to Defendants for the transaction with Arch do meet the "but for" requirement for legal malpractice damages claims. Summary judgment on Tarter's attorneys' fees claim is therefore not appropriate.

## IV.    Conclusion

For the foregoing reasons, IT IS HEREBY ORDERED that Defendant's motion for summary judgment on Tarter's damages claims (Doc.17) is GRANTED in part and DENIED in part.

DATED this 6th day of February 2019.

Susan P. Watters
SUSAN P. WATTERS
United States District Judge